UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------- X
                    :

MOHAMED SHOHRAB HOSSAIN,    :
                    :

          Plaintiff,    :            **REPORT AND**
                    :            **RECOMMENDATION**
   -against-          :            1:20-CV-3966 (DG)(PK)
                    :

MANHATTAN SHERATON      :
CORPORATION d/b/a THE ST. REGIS  :
NEW YORK,            :
                    :
         Defendant.   :
                    :
---------------------------------------------------- X

**Peggy Kuo, United States Magistrate Judge:**

Mohamed Shohrab Hossain ("Plaintiff") brings this action against Manhattan Sheraton Corporation (d/b/a The St. Regis New York) ("Defendant" or the "Hotel") for discrimination on the basis of his age, race/color, religion, and national origin. (Compl., Dkt. 1.) Plaintiff brings claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code § 8-107 *et seq.* (Compl. ¶ 2.)

Before me on referral from the Honorable Diane Gujarati is Defendant's Motion for Summary Judgment. ("Motion," Dkt. 25.) For the reasons stated herein, I respectfully recommend that the Motion be granted.

**FACTUAL BACKGROUND**

Unless otherwise stated, the following facts are taken from Defendant's Rule 56.1 Statement ("Def. 56.1," Dkt. 25-1); Plaintiff's Rule 56.1 Counterstatement ("Pl. 56.1," Dkt. 26-1); the Exhibits attached to the Motion; and the Exhibits attached to Plaintiff's Memorandum of Law in Opposition

to Defendant's Motion for Summary Judgment ("Opposition").  ("Pl. Mem. of Law," Dkt. 26.)  The

following facts are generally agreed upon by the parties, unless otherwise noted.

I.  **Plaintiff's Hiring, Responsibilities, and Coworkers**

Plaintiff is a Bangladeshi Muslim who was employed by Defendant from November 29, 1991

until November 14, 2019, when he was terminated for "theft of time."  (Def. 56.1 ¶¶ 1, 6; Pl. 56.1 ¶¶

1, 6.)  At the time of his termination, he was 59 years old.[1]  (Pl. Tr. 24:4-5.)  Defendant is a luxury

hotel located at 2 East 55th Street in Manhattan.  (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.)

Plaintiff was hired by Defendant as an Order Taker/Cashier and was promoted to Supervisor

of Order Takers/Cashiers in 1994, a position he maintained until his termination.  (Def. 56.1 ¶ 6; Pl.

56.1 ¶ 6.)  Plaintiff's job responsibilities "included taking and conveying room service orders,

answering guest questions, communicating meal requirements, recording sales transactions, and

processing payments."  (Def. 56.1 ¶ 7 (citing Plaintiff's Deposition Transcript ("Pl. Tr.") 52:7-10, Ex.

C to Declaration of Brian Murphy ("Murphy Decl."), Dkt. 25-9; Ex. G to Murphy Decl., Dkt. 25-13);

Pl. 56.1 ¶ 7.)  At all relevant times, Plaintiff reported to the Food & Beverage Manager, who, from on

or about late 2017 or early 2018, was Vadim Morozov.  (Def. 56.1 ¶ 8 (citing Pl. Tr. 53:17-25, 54:2-10);

Pl. 56.1 ¶ 8.)  Plaintiff and Morozov had a "very good" relationship.  (Def. 56.1 ¶ 8 (citing Pl. Tr.

54:13); Pl. 56.1 ¶ 8.)

Metin Erkin, a 54-year-old Turkish Muslim, was the Director of Human Resources Operations

for Defendant.  (Def. 56.1 ¶ 9 (citing Declaration of Metin Erkin ("Erkin Decl.") ¶ 3, Dkt. 25-3); Pl.

56.1 ¶ 9.)  Plaintiff knew Erkin for 25 years, and they had a "very good personal relationship."  (Def.

56.1 ¶ 10 (citing Pl. Tr. 38:21-39:4); Pl. 56.1 ¶ 10; *see* Erkin Decl. ¶ 8.)

The other Order Takers/Cashiers at the Hotel were: (1) Marilyn Choute, who is "a few years

younger than [Plaintiff]," from Haiti, and is Christian (Pl. Tr. 65:2-11); (2) William Naji, who is one

---

[1] Plaintiff was born in March 1960.  (Pl. Tr. 24:4-5.)

year younger than Plaintiff, from Iraq, and is Muslim (Pl. Tr. 63:24-64:10); (3) Katheline Compere, who is "probably a couple years younger than [Plaintiff]," from Haiti, and is Catholic  (Pl. Tr. 64:11-24); (4) Jason Cole, who is "probably 65 and up" and is American (Pl. Tr. 63:13-21); (5) Carmenza Vargas, who is about 70 years old, from either the Dominican Republic, the Caribbean, or Columbia, and is Christian  (Pl. Tr. 65:16-24); and (6) Sanaa Fahmy, who was 71 years old in April 2021 (Deposition Transcript of Sanaa Fahmy ("Fahmy Tr.") 7:24-25, Ex. D to Murphy Decl., Dkt. 25-10), was born in Egypt, is Orthodox Christian (Pl. Tr. 63:7-10), and identifies as white (Fahmy Tr. 8:2-3).  (*See also* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.)

Plaintiff has worked with the same group of people for many years.  (*See* Pl. Tr. 66:16-22.) Plaintiff is fourth in seniority, meaning that he was hired after three Order Takers/Cashiers (Fahmy, Naji, and Cole), but before three others (Vargas, Choute, and Compere).  (Pl. Tr. 66:16-25; Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.)  The Order Takers/Cashiers worked the following shifts: "(i) 6:15AM-1:15PM; (ii) 7:15AM-2:15PM; (iii) 2PM-9PM; (iv) 4:30PM-12AM; and (v) 11:30PM-6:30AM."  (Def. 56.1 ¶ 12 (citing Pl. Tr. 67:10-16); Pl. 56.1 ¶ 12.)  "Plaintiff ordinarily worked the 7:15AM-2:15PM shift."  (Def. 56.1 ¶ 12 (citing Pl. Tr. 68:5-7); Pl. 56.1 ¶ 12.)

In or around November 2019, Plaintiff estimated that there were approximately 40 to 50 employees who were from Bangladesh working at the Hotel (Def. 56.1 ¶ 64 (citing Pl. Tr. 25:20-26:5); Pl. 56.1 ¶ 64), and approximately 20 to 30 employees who were practicing Muslims.  (Def. 56.1 ¶ 65 (citing Pl. Tr. 26:9-25); Pl. 56.1 ¶ 65.)

## II.    **Plaintiff's Request for Prayer Room and Defendant's Actions Related to Race and Religion**

Some of Plaintiff's coworkers called him "Mullah," which translates to "reverend" and is a religious term. (Def. 56.1 ¶ 61 (citing Pl. Tr. 175:17-176:7); Pl. 56.1 ¶ 61.)  Plaintiff took the name as a joke and was not offended by it.  (Def. 56.1 ¶ 61 (citing Pl. Tr. 176:8-16); Pl. 56.1 ¶ 61.)  Erkin never called Plaintiff "Mullah."  (Def. 56.1 ¶ 61 (citing Pl. Tr. 176:8-16); Pl. 56.1 ¶ 61.)

Plaintiff requested a prayer room in possibly 2013, 2014, or 2015 (Pl. Tr. 41:2-4; 182:5-8) and believes that Erkin treated him differently after the request. (Pl. 56.1 ¶ 62 (citing Pl. Tr. 39:5-9).) At the time Plaintiff made the request, Erkin was the Coordinator of Human Resources. (Pl. Tr. 40:19-22.) The person who was the Director of Human Resources at the time granted Plaintiff's request and designated the prayer room. (Pl. Tr. 40:15-22, 41:5-7.)

Plaintiff states that Defendant discriminated against at least three employees in the past. (Pl. 56.1 ¶ 67; Pl. Tr. 42:11-15.) He believes that these employees were terminated because of their age and race. (Pl. Tr. 45:4-25.) He also states that there was a Chinese woman working at the Hotel who was suspended for drinking water out of the hotel and that he believes she was suspended for being Chinese. (Pl. Tr. 207:21-208:12.)

Frantz Sanon is 58 years old, of "Black and African decent," and is "not a religious person." (Deposition Transcript of Frantz Sanon ("Sanon Tr.") 7:17-8:2, Ex. G to Declaration of Suriya Rahman ("Rahman Decl."), Dkt. 26-9.) He is still employed by the Hotel, but was on leave in April 2021 because of the pandemic. (Sanon Tr. 8:5-13.) Sanon experienced racism at the Hotel and when he reported it, Erkin told him that he would investigate, but nothing was done. (Sanon Tr. 13:9-14:7, 34:10-35:20.)

## III.   Early Retirement Offers

In or around early 2016, Erkin presented Plaintiff with a verbal early buyout or retirement offer. (Def. 56.1 ¶ 21 (citing Pl. Tr. 166:19-167:10, 168:5-10); Pl. 56.1 ¶ 21.) Plaintiff told Erkin that he was not ready to retire, and Erkin did not appear angry when Plaintiff rejected the offer. (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.) Instead, Erkin asked Plaintiff whether Fahmy or Vargas would be interested in a voluntary early retirement offer. (Def. 56.1 ¶ 22 (citing Pl. Tr. 169:6-15, 170:7-10); Pl. 56.1 ¶ 22.) Plaintiff stated that they might be, and spoke with Fahmy and Vargas about the offer. (Def. 56.1 ¶ 22 (citing Pl. Tr. 169:6-15, 170:7-10, 172:5-24); Pl. 56.1 ¶ 22.) Neither took the offer. (Def. 56.1 ¶ 22

(citing Pl. Tr. 172:5-24); Pl. 56.1 ¶ 22.)  Fahmy remains employed by Defendant.  (Def. 56.1 ¶ 19 (citing Fahmy Tr. 9:18-10:8); Pl. 56.1 ¶ 19.)  In her deposition, Fahmy stated that she was never offered early retirement by Defendant and that she heard from Plaintiff that an offer was made to Vargas. (Fahmy Tr. 13:10-23.)

Plaintiff stated that "in 2016, end of '16 and '17," Erkin asked him if he was ready to retire. (Pl. Tr. 170:25-171:4.)  Plaintiff stated that the last time that Erkin approached him about taking a severance offer was "the end of 2016 or early 2017."  (Pl. Tr. 173:8-19.)

## IV.    Plaintiff's Overtime Shift Grievance

Order Takers/Cashiers, including Plaintiff, were eligible to work overtime shifts at one-and-a-half times their regular rate of pay if they worked over seven hours in a day (Def. 56.1 ¶ 13 (citing Pl. Tr. 59:8-60:3); Pl. 56.1 ¶ 13), and time-and-a-quarter "if they worked a shift alone during certain times of the day and when occupancy exceeds certain thresholds."  (Erkin Decl. ¶ 6.)  "Extra shifts were offered in order of seniority."  (Def. 56.1 ¶ 14 (citing Pl. Tr. 69:12-25); Pl. 56.1 ¶ 14.)

Between April 2017 and April 2019, Defendant failed to assign Plaintiff overtime shifts consistent with the seniority process.  (Def. 56.1 ¶ 15 (citing Pl. Tr. 71:16-72:2); Pl. 56.1 ¶ 15.)  Rather, Plaintiff contended that "Erkin assigned overtime to Katheline Compere instead of Plaintiff or Fahmy, each of whom had more seniority than Compere."  (Def. 56.1 ¶ 16 (citing Pl. Tr. 73:2-15, 73:22-74:2); Pl. 56.1 ¶ 16.)

On April 5, 2019, Plaintiff filed a "Voluntary Statement Form" with the Hotel in which he stated that Compere falsely told Morozov that Plaintiff did not want overtime shifts that were available on future dates in April 2019.  ("Voluntary Statement Form," Ex. H to Murphy Decl. at 1, Dkt. 25-14; Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)  Plaintiff wrote that when he confronted Compere, she yelled at him and called him a liar, and that he was "shocked, embarrassed, and hurt" and wanted the incident investigated.  (Voluntary Statement Form at 2.)  Plaintiff later asserted that Erkin was also involved,

and that he believes Erkin told Morozov to give the shift to Compere.  (Pl. Tr. 88:5-25.)  Plaintiff

submitted a grievance to the union related to the overtime issue.  (Def. 56.1 ¶ 18 (citing Pl. Tr. 77:4-7,

78:2-19); Pl. 56.1 ¶ 18.)

## V.     The "Paid Rest Period Policy" and Theft of Time

### A.  The Contested Paid Rest Period Policy

The parties disagree on whether Defendant maintained a "Paid Rest Period Policy."  (*See, e.g.*,

Pl. 56.1 ¶ 25; Def. 56.1 ¶ 25.)  Plaintiff contends that Defendant maintained a Paid Rest Period Policy

"for nearly a decade" prior to November 2019  (*see* Pl. 56.1 ¶ 25 (citing Pl. Tr. 96:6-98:11)), which

provided, generally, that when an employee worked two shifts in a day, he or she could take a "Paid

Rest Period" between the two shifts.  (*See* Def. ¶ 25; Pl. 56.1 ¶ 25; Pl. Tr. 97:24-98:17.)  According to

Plaintiff, Carlos Garcia, the former Director of Room Service, implemented the Paid Rest Period

Policy in 2012 or earlier.  (Def. 56.1 ¶ 29 (citing Pl. Tr. 107:18-20, 112:24-113:4); Pl. 56.1 ¶ 29.)  The

policy was implemented because another employee, William Naji, would go on vacation for one week

every July and August and no one wanted to cover his shifts.  (Pl. Tr. 96:11-98:17.)  As an incentive,

Garcia stated that if Plaintiff took the shifts, he would pay him for two-and-a-half hours between the

shifts.  (Pl. Tr. 98:12-100:15.)  In the beginning, Plaintiff would punch in and out between shifts, but

Garcia later told Plaintiff that it was easier if he did not punch out.  (Pl. Tr. 104:17-25.)

The parties agree that the Paid Rest Period Policy was not in writing.  (Def. 56.1 ¶ 27 (citing

Pl. Tr. 102:7-10); Pl. 56.1 ¶ 27.)  Plaintiff alleges that since the policy was implemented, "Defendant

approved [his] time sheets and payroll consistently with the Paid Rest Policy."  (Pl. 56.1 ¶ 24.)

Plaintiff states that during the paid rest period, he was allowed to remain "clocked in," and

therefore, would be paid, while he was not working.  (Def. 56.1 ¶ 25 (citing Pl. Tr. 97:24-98:17,

100:7-15, 113:21-24).)  He would "ordinarily either remain in the Room Service booth assisting a

coworker, take a quick shower within The St. Regis, or deal with workplace complaints in his role as union delegate." (Def. 56.1 ¶ 26 (citing Pl. Tr. 98:12-17, 100:16-101:10); Pl. 56.1 ¶ 26.)

Plaintiff stated that the Paid Rest Period Policy applied to only double shifts such as those he took when Naji was on vacation or called in sick. (*See* Pl. Tr. 112:24-113:11.) He stated that "no other employee ever agreed to work the full double shifts he worked . . . and then return to work the next morning at 7:15 am." (Pl. 56.1 ¶ 28 (citing Pl. Tr. 99:7-100:15, 205:8-17).) If he could not take one of the double shifts, "managers would work around the lack of coverage by working a portion of the second shift." (Pl. 56.1 ¶ 28 (citing Pl. Tr. 205:24-206:8).)

While Plaintiff took paid rest, one employee would be working alone. (*See* Pl. Tr. 107:5-12.) According to Plaintiff, the person working alone was not entitled to time-and-a-quarter for those hours. (Pl. Tr. 107:5-12.) There were four other individuals who Plaintiff believed had taken paid rest. (*See* Pl. Tr. 110:23-111:14.) Plaintiff "assumed" these other individuals took paid rest time because they did not punch in or out. (Pl. Tr. 111:22-112:8.) He believed Fahmy may have taken paid rest on one occasion. (Pl. Tr. 111:15-112:23, 118:9-17.)

Fahmy testified that she may have covered a double shift once or twice and that she always clocked in and out between shifts. (Fahmy Tr. 22:16-23.)

Plaintiff never discussed the Paid Rest Period Policy with Erkin and assumed Erkin was aware of it. (Def. 56.1 ¶ 31 (citing Pl. Tr. 117:16-118:17, 120:17-121:7); Pl. 56.1 ¶ 31.) Fahmy stated that she never discussed clocking in and out between shifts with Erkin. (Fahmy Tr. 22:4-7.) Plaintiff contends that he discussed the Paid Rest Period Policy with Morozov when Morozov began supervising Plaintiff. (Pl. 56.1 ¶ 36 (citing Pl. Tr. 139:25-140:19).)

Defendant states that it maintained a "Pay Practices and Procedures Policy," which required, *inter alia*, that employees accurately record their time, and stated that employees would be disciplined if they did not do so. (Def. 56.1 ¶ 24 (quoting Ex. K to Murphy Decl., Dkt. 25-17).) Defendant

contends that Plaintiff admitted that the alleged Paid Rest Period Policy was in conflict with its Pay Practices and Procedures Policy (Def. 56.1 ¶ 27 (citing Pl. Tr. 116:16-20)), but Plaintiff stated that he never received a copy of the Pay Practices and Procedures Policy.  (Pl. 56.1 ¶ 27.)  Erkin stated that he was "unaware of any 'Paid Rest Period Policy' or any other policy that would permit an [employee] to remain on the clock to be paid for time when the [employee] was not working, other than for very brief (i.e. less than 10 or 15 minute) breaks."  (Erkin Decl. ¶ 21.)

### B. *Plaintiff's Alleged Theft of Time*

Around August 5, 2019, Compere requested that her pay be adjusted to reflect a time-and-one-quarter premium for working alone for three hours on July 17, 2019.  (Def. 56.1 ¶ 32 (citing Pl. Tr. 127:15-23, 128:12-16); Erkin Decl. ¶ 6; *see* Pl. 56.1 ¶ 32.)  While reviewing the payroll records for that date, Erkin observed that Plaintiff was "on the clock" during the time that Compere stated she was working alone.  (Def. 56.1 ¶ 33 (citing Erkin Decl. ¶ 7).)  Erkin cross-referenced the room service orders with the ID numbers for each of the Order Takers/Cashiers and found that, despite being "on the clock," Plaintiff did not take any orders for approximately three hours that day.  (Def. 56.1 ¶ 33 (citing Erkin Decl. ¶ 7).)  Plaintiff states that he disagrees with Defendant's statement of these facts, but does not identify information in the record to the contrary.  (*See* Pl. 56.1 ¶¶ 32, 33.)

Plaintiff's supervisor, Morozov, had approved Plaintiff's request to leave work to attend a doctor's appointment on July 17.  (Pl. 56.1 ¶ 35 (citing Pl. Tr. 133:15-134:3).)  Plaintiff did not specifically tell Morozov that he would remain "on the clock" when he left.  (Def. 56.1 ¶ 34 (citing Pl. Tr. 130:24-131:8, 131:15-132:2, 134:4-6).)

On August 7, 2019, Plaintiff told Erkin that he left the hotel for only 25 minutes on July 17.  (Def. 56.1 ¶ 34 (citing Erkin Decl. ¶ 8).)  Although Plaintiff disagrees with this statement, he does not point to any contradictory evidence.  (*See* Pl. 56.1 ¶ 34.)  Upon review of the surveillance footage, Erkin found that Plaintiff left the hotel for approximately three hours, rather than 25 minutes, on July

17, as well as on July 16 and July 19.  (Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37; *see* Def. 56.1 ¶ 35; Erkin Decl. ¶ 9.)

On or about August 9, 2019, Erkin asked Morozov and Edgar Delgado, another Food & Beverage Manager, if either of them allowed Plaintiff to leave the hotel while he was on the clock.  (Def. 56.1 ¶ 36 (citing Erkin Decl. ¶ 10).)  Plaintiff disagrees with this statement but, again, fails to identify facts to the contrary.  (*See* Pl. 56.1 ¶ 36.)  Both individuals "denied having granted Mr. Hossain permission" to leave the hotel while on the clock.  (Def. 56.1 ¶ 36 (citing Erkin Decl. ¶ 10).)  In addition, Morozov stated that he was not working on July 17, 2019 and could not have given Plaintiff permission to leave that day.  (Erkin Decl. ¶ 10.)

During his deposition, Plaintiff stated that he left the hotel "while 'on the clock' for 2 hours and 44 minutes on July 16, 2019 to visit a healthcare center," "for 3 hours and 22 minutes on July 17, 2019 to visit a healthcare center," "and for 3 hours and 5 minutes on July 19, 2019" to take a shower at another hotel.  (Def. 56.1 ¶ 38 (citations omitted); Pl. 56.1 ¶ 38 (citing Pl. Tr. 135:3-136:5).)  These were the only times that Plaintiff left the hotel for an extended period of time while still "on the clock."  (Def. 56.1 ¶ 39 (citing Pl. Tr. 13:2-9, 101:25-102:6); Pl. 56.1 ¶ 39.)

Erkin concluded that "Mr. Hossain had violated [Defendant's] Pay Practices Policy. . . [by] intentionally creat[ing] false time records that allowed him to be paid for time that he was not working."  (Erkin Decl. ¶ 13; *see* Def. 56.1 ¶ 40.)  Plaintiff disagrees with this statement on the basis that Erkin's conclusion was incorrect and that during the previous eight to ten years of his employment with Defendant, Plaintiff was never warned that the Paid Rest Period Policy was not Defendant's actual policy.  (*See* Pl. 56.1 ¶ 40.)

Defendant considers "theft of time" to be when a worker does not "punch out" while they are not working; it has a "zero tolerance policy" for theft offenses.  (Erkin Decl. ¶ 13.)  "On August 14, 2019, Erkin proposed that Plaintiff be terminated for 'theft of time.'"  (Def. 56.1 ¶ 42 (citing Pl.

Tr. 122:18-23; Erkin Decl. ¶ 15).)  Plaintiff disagrees with this statement, stating that he was not given the Disciplinary Action Form until after August 14, 2019.  (*See* Pl. 56.1 ¶ 42.)  Plaintiff did, however, learn of his termination on August 14, 2019.  (Pl. Tr. 123:7-124:24.)  The Director of Human Resources for the Hotel and Defendant's General Manager approved Plaintiff's termination.  (Erkin Decl. ¶ 5.)

Plaintiff admits that there are no facts that suggest his termination was motivated by his Bangladeshi national origin.  (Def. 56.1 ¶ 63 (citing Pl. Tr. 181:8-13); Pl. 56.1 ¶ 63.)

Plaintiff appealed his termination through union grievance procedures.  (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43.)  He was permitted to continue working while his appeal was being processed because he was a union delegate.  (Def. 56.1 ¶ 43 (citing Pl. Tr. 137:21-138:8, Erkin Decl. ¶ 15); Pl. 56.1 ¶ 43.)  An employee may work while appealing a termination unless he "committed an act of workplace violence, in which case the individual would be removed from the Hotel pending any appeal."  (Def. 56.1 ¶ 43 (citing Pl. Tr. 138:9-11); Pl. 56.1 ¶ 43.)

Following Plaintiff's termination, Erkin again asked both Morozov and Delgado whether either of them had approved Plaintiff leaving the hotel while on the clock.  (Def. 56.1 ¶ 45 (citing Erkin Decl. ¶ 16).)  Both stated that they had not and would never approve an employee being paid while not working.  (Def. 56.1 ¶ 45 (citing Ex. B to Erkin Decl., Dkt. 25-5).)  Plaintiff believes that Erkin did not sufficiently investigate Plaintiff's alleged theft of time.  (Pl. 56.1 ¶ 45.)

On October 14, 2019, Erkin called Plaintiff into his office to ask him about clocking into work an hour before his scheduled shift the day before.  (Pl. 56.1 ¶ 51 (citing Pl. Tr. 201:5-16; Ex. E to Rahman Decl., Dkt. 26-7).)  Plaintiff told Erkin that he swapped shifts with Fahmy and that he informed his manager about the swap, but that he did not ask permission because he is a supervisor and "can do things like that."  (Ex. E to Rahman Decl. at 1.)

10

**VI.    Plaintiff's Alleged Workplace Violence**

On or about October 16, 2019, while Plaintiff's appeal was still pending, Morozov accused Plaintiff of "initiating physical contact with him" while working.  (Def. 56.1 ¶ 46 (citing Pl. Tr. 141:12-18, Erkin Decl. ¶ 17); Pl. 56.1 ¶ 46.)  In a written statement, Morozov reported that when he confronted Plaintiff about an upset guest, "[Plaintiff] put his right hand on my left shoulder and hit my chest with his elbow with great force."  ("Morozov Statement," Ex. O to Murphy Decl. at 3 (ECF pagination), Dkt. 25-21; Def. 56.1 ¶ 47.)  Morozov also stated that immediately thereafter, "I realized my pulse was pounding.  I felt discomfort and heaviness in my heart area; I felt pressure in my chest." (Morozov Statement at 3.)  He sought medical treatment and filed a police report.  (Erkin Decl. ¶¶ 17, 19; Def. 56.1 ¶ 47.)

Plaintiff disagrees with these statements, stating that he only "patted [Morozov] on the shoulder" to get his attention.  (Pl. 56.1 ¶¶ 47, 48, 50; Def. 56.1 ¶ 48 (citing Pl. Tr. 143:4-11, 21-24).) Plaintiff further "disputes ever initiating any other contact with Morozov, including 'elbowing him in the chest.'"  (Def. 56.1 ¶ 48 (citing Pl. Tr. 146:8-15); Pl. 56.1 ¶ 48.)

Plaintiff did not feel comfortable discussing Morozov's accusation with Erkin the next day, because he felt that Erkin was "targeting him" and treating him unfairly.  (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49; Pl. Tr. 200:16-201:4.)  However, he met with Erkin after being urged to do so by union delegates. (Def. 56.1 ¶ 49 (citing Pl. Tr. 147:20-148:11; Erkin Decl. ¶ 18); Pl. 56.1 ¶ 49.)  During the meeting, Plaintiff stated that he may have "nudged" Morozov (although Plaintiff later noted during his deposition that he was confused about the meaning of the term "nudge").  (Def. 56.1 ¶ 50 (citations omitted); Pl. 56.1 ¶ 50.)  As a result, Erkin told Plaintiff to leave the premises.  (Def. 56.1 ¶ 51 (citing Pl. Tr. 154:11-17; Erkin Decl. ¶ 19); Pl. 56.1 ¶ 51.)  Before telling him to leave, Erkin did not review security footage to see if Plaintiff made contact with Morozov.  (Pl. 56.1 ¶ 51.)

11

Plaintiff was previously accused of workplace violence on three occasions while working for Defendant.  (Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52.)

## VII.   Resolution of Plaintiff's Grievance and Challenge to Termination Decision

On November 1, 2019, Plaintiff settled his overtime grievance with Defendant by entering into a Voluntary Settlement Agreement ("VSA").  Defendant paid him $2,176.00 for Defendant's "failure to properly call [Plaintiff] for overtime shifts between April 2017 and April 2019. . . ."  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18; Voluntary Settlement Agreement ("VSA"), Ex. I to Murphy Decl., Dkt. 25-15.)  The VSA included "a general release by [Plaintiff] against . . . [the Hotel] . . . for any and all matters arising out of this grievance, under federal, state and local labor, employment and discrimination laws and regulations."  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18; VSA ¶ 5.)

On or about November 14, 2019, Plaintiff participated in an arbitration hearing regarding his termination for theft of time and workplace violence.  (Def. 56.1 ¶ 55 (citing Pl. Tr. 160:20-161:5); Pl. 56.1 ¶ 55.)  Plaintiff described the arbitration hearing as a "sham" (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56) and stated that he received less than 24 hours notice of the hearing.  (Pl. 56.1 ¶ 56.)  He faulted the union, however, for the problems surrounding the arbitration hearing.[2]  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57.)  At the arbitration hearing Plaintiff had representation through the union, was permitted to present witnesses, and testified.  (Def. 56.1 ¶ 56 (citing Pl. Tr. 161:9-22, 162:6-12, 165:24-25); Pl. 56.1 ¶ 56.)

On December 3, 2019, the arbitrator issued an award upholding Plaintiff's termination based on theft of time.  (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.)  The arbitrator found the issue of Plaintiff's proposed

---

[2] Plaintiff stated, "My union representative and lawyer, refused to translate any of the legal documents and accusations made against me, essentially cornering me into a termination hearing that did not allow me to speak on my behalf.  The union appointed lawyer (which was all I could afford at the time) was refusing to translate to Bengali, and advocate on my behalf."  (Def. 56.1 ¶ 57 (quoting Ex. F to Murphy Decl., Dkt. 25-12).)

termination for workplace violence moot in light of the "theft of time" award.  (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.)

An Administrative Law Judge ("ALJ") at the New York Unemployment Insurance Appeals Board found that Plaintiff "engaged in no misconduct which would prevent him from receiving unemployment benefits."  (Pl. 56.1 ¶ 58 (citing Ex. F to Rahman Decl., Dkt. 26-8).)

No mediation was held regarding Plaintiff's termination by Defendant.  (Def. 56.1 ¶ 53; Pl. 56.1 ¶ 53.)[3]  Plaintiff states this was the union's fault.  (Def. 56.1 ¶ 54 (citing Pl. Tr. 157:2-5, 160:12-19); Pl. 56.1 ¶ 54.)

## PROCEDURAL BACKGROUND

Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") on February 27, 2020.  (Compl. ¶ 4.)  On March 5, 2020, Plaintiff submitted a letter to the EEOC in which he stated that he believed he "was a victim of race and age discrimination, as well as retaliation."  ("EEOC letter," Ex. J to Murphy Decl., Dkt. 25-16; Murphy Decl. ¶ 11.)  In the letter, Plaintiff mentioned the early retirement offers Erkin had made him, the three days of work on which he did not clock out between shifts, and Erkin questioning him about clocking in early on one date. (EEOC Letter at 2-3.)  With regard to the overtime shifts, Plaintiff stated:

> Previously, I had two grievances against the St. Regis during August and September 2019, regarding overtime practice against the union's seniority policy – I won both of them.  Due to their breach of contract.  I have reason to believe Mr. Metin [Erkin] is pursuing revenge against me for these cases.

(*Id.* at 2.)  He also stated that Defendant "used [his] immigration status and limited English proficiency against [him]."  (*Id.* at 3.)

Plaintiff received a Right to Sue letter on June 3, 2020.  (Compl. ¶ 4.)

---

[3] Plaintiff stated that "[t]he Union mailed [him] a total of three letters with dates and times for a mediation, all of which never happened."  (Def. 56.1 ¶ 57 (quoting Ex. F to Murphy Decl.).)

Plaintiff filed the Complaint on August 26, 2020, alleging thirteen claims. Each Claim alleges discrimination, retaliation, and hostile work environment pursuant to a specific protected classification. Claims I through IV are based on Plaintiff's age, and allege violations of the ADEA, the NYSHRL, the NYCHRL, and 42 U.S.C. § 1981. Claims V through VII are based on Plaintiff's race/color and allege violations of Title VII, the NYSHRL, and the NYCHRL. Claims VIII through X relate to national origin and allege violations of Title VII, the NYSHRL, and the NYCHRL. Finally, Claims XI through XIII relate to religion, and allege violations of Title VII, the NYSHRL, and the NYCHRL.

On July 6, 2021, Defendant served a copy of its Motion for Summary Judgment on Plaintiff. In accordance with the Honorable Diane Gujarati's Individual Practices Rules ("Individual Practice Rules of Judge Diane Gujarati" § III.B.4), the fully briefed Motion was filed on September 3, 2021. (*See* Pl. Mem. of Law; "Reply," Dkt. 27.)

Defendant argues that summary judgment should be granted as to all Claims because, *inter alia*, Plaintiff has failed to establish a *prima facie* case of discrimination or retaliation. (Def. Mem. of Law at 5, 17; Reply at 3-5, 10.) Additionally, Defendant argues that it terminated Plaintiff not under circumstances giving rise to an inference of discrimination, but because Plaintiff admitted to theft of time and engaged in workplace violence. (Def. Mem. of Law at 5-8.) Further, Defendant asserts that Plaintiff has failed to demonstrate that he was treated less well than similarly situated colleagues with respect to any protected classification. (*Id.* at 11.) Defendant also argues that some of Plaintiff's claims should be dismissed because they are outside the applicable statute of limitations, barred pursuant to the VSA, or abandoned because Plaintiff did not address them in his Opposition. (*See id.* at 13-14, 19; Reply at 2-3.)

# DISCUSSION

## I.    Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Rule 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

"In ruling on a summary judgment motion, the district court must 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment' and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citation omitted)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).  A "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"It is the movant's burden to show that no genuine factual dispute exists . . . ." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).  Once the movant satisfies its burden, the party opposing summary judgment "must point to specific evidence in the record" demonstrating a genuine issue for trial and "cannot rest on allegations in the pleadings." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## II.    **Claims Based on Age**

Claims I through IV allege age-based discrimination, retaliation, and hostile work environment under the ADEA (Claim I), the NYSHRL (Claim II), the NYCHRL (Claim III), and 42 U.S.C. § 1981 (Claim IV).

### A.  *ADEA (Claim I) and the NYSHRL (Claim II)*

The discrimination, retaliation, and hostile work environment claims based on age under the ADEA and the NYSHRL will be discussed together.  *See Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 181 (E.D.N.Y. 2017) (burden-shifting framework applied to both statutes); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 19 (E.D.N.Y. 2015) (same).

#### 1.  **Age-Based Discrimination under the ADEA and the NYSHRL**

##### a.  *Legal Standard*

In analyzing discrimination claims under the ADEA and the NYSHRL, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, an employee must first establish a *prima facie* case of discrimination.  *Id.* at 802.  Once a *prima facie* case is established, the burden shifts to the employer to articulate a non-discriminatory reason for the employment decision.  *Id.* at 802-03; *see Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 439 (S.D.N.Y. 2007), *aff'd*, 331 F. App'x 874 (2d Cir. 2009).  If the employer has provided a non-discriminatory explanation for its action, the burden shifts to the employee to show by a preponderance of the evidence that the legitimate reason offered by the employer was pretext.  *McDonnell Douglas*, 411 U.S. at 804; *see Ehrbar*, 131 F. Supp. at 5, 19.

With regard to this last step, the ADEA requires that a plaintiff demonstrate but-for causation, *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 n.2 (2d Cir. 2014), while under the NYSHRL, a "plaintiff need only prove that the employer's [or supervisor's] stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action."  *Milord-Francois v. N.Y.S. Office of Medicaid Inspector*

*Gen.*, No. 20-CV-3646, 2022 WL 480477, at *2 (2d Cir. Feb. 17, 2022) (alteration and emphasis in original) (citation omitted).

To establish a *prima facie* case of discrimination, Plaintiff must demonstrate that he "(1) was within a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Green v. Town of E. Haven*, 952 F.3d 394, 401 (2d Cir. 2020) (quoting *Green v. E. Haven Police Dep't*, No. 16-CV-321, 2017 WL 6498144, at *6 (D. Conn. Dec. 19, 2017)).

In the context of a disparate treatment claim, "a plaintiff suffers an adverse employment action if [he] endures a materially adverse change in the terms and conditions of [his] employment, such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,' 'a disproportionally heavy workload,' or 'other indices unique to a particular situation.'" *Winslow v. Pulaski Acad.*, 448 F. Supp. 3d 197, 207 (N.D.N.Y. 2020) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (citation omitted)). For an action to qualify as an "adverse employment action," it "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Vega*, 801 F.3d at 85 (citation omitted)).

The adverse action must occur under circumstances giving rise to an inference of discrimination. "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action].'" *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted)). "[A] showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized

method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20–21 (2d Cir. 2013) (citation to summary order) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Id.* at 21 (quoting *Ruiz*, 609 F.3d at 493-94).

       *b.  Application of Facts to Law*

The ADEA prohibits discrimination against individuals over forty. *See Green*, 952 F.3d at 403 (quoting 29 U.S.C. § 631(a)). The NYSHRL prohibits discrimination against "an individual eighteen years of age or older." *See Rimpel v. AdvantageCare Physicians, P.C.*, 486 F. Supp. 3d 625, 634 (E.D.N.Y. 2020) (quoting N.Y. Exec. Law § 296(3-a)).

There is no dispute that the first three factors necessary to establish a *prima facie* case are satisfied here: (1) Plaintiff was 59 years old at the time of his termination and, therefore, a member of the protected class (*see* Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1); (2) Plaintiff was qualified for his position and had worked for the Hotel for approximately 27 years (*see* Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1); and (3) Plaintiff was subject to an adverse employment action in that he was terminated (*see* Def. 56.1 ¶¶ 51, 58; Pl. 56.1 ¶¶ 51, 58). *See Green*, 952 F.3d at 404 (discharge is adverse employment action); *Ehrbar*, 131 F. Supp. 3d at 21 (finding plaintiff suffered an adverse employment action when defendants terminated her). Plaintiff does not argue that he suffered any other adverse employment actions as a result of his age. (*See* Pl. Mem. of Law at 3 ("Mr. Hossain suffered adverse employment action when he was terminated from his employment with Defendant." (citing Pl. 56.1 ¶ 6)).)

The fourth factor necessary to establish a *prima facie* case, however, has not been satisfied. Plaintiff has not shown that he was terminated under circumstances giving rise to an inference of age discrimination. The circumstances Plaintiff points to are: (1) he made a grievance for the overtime policy violation (Pl. Mem. of Law at 3); (2) he refused Erkin's early retirement offers (*id.*); and (3)

Erkin "constantly urged [him] to retire." (*Id.* at 5 (citing Pl. 56.1 ¶ 59).)  He argues that he would not have been terminated "but for" the fact that he was sixty years old.  (*Id.* at 3.)

Although Plaintiff references the overtime grievance, Plaintiff's argument that he was terminated for making the overtime grievance goes to his retaliation claim, not his disparate treatment claim.  The same is true of Plaintiff's argument that he was terminated as a result of rejecting Erkin's offers of early retirement.  Both of these allegations involve conduct on the part of Plaintiff—making a grievance and rejecting retirement offers—not actions by Defendant that may lead to an inference of discrimination.

Plaintiff points to no statements by Defendant regarding his age.

Evidence that Erkin "constantly urged Plaintiff to retire" does not, without more, support an inference that Plaintiff was terminated because of his age.  There is nothing inherently discriminatory about early retirement offers, so the fact that they were offered to Plaintiff and he rejected them sheds no light on whether Plaintiff was terminated for discriminatory reasons.  *See, e.g.*, *Boonmalert v. City of N.Y.*, No. 16-CV-4171 (KMW)(KNF), 2017 WL 1378274, at *4 (S.D.N.Y. Apr. 12, 2017) ("[D]iscussion of retirement is common in offices, even between supervisors and employees, and is typically unrelated to age discrimination." (quoting *Hamilton*, 528 F. Supp. 2d at 447)); *Stetson v. Nynex Serv. Co.*, No. 90-CV-5518 (CSH), 1992 WL 276574, at *4 (S.D.N.Y. Sept. 30, 1992) ("[I]t is well settled that the mere offer of an early retirement plan does not violate the ADEA." (citing *Gray v. York Newspapers*, 957 F.2d 1070 (3d Cir. 1992); *Schuler v. Polaroid Corp.*, 848 F.2d 276, 278 (1st Cir. 1988)) (additional citation omitted)).  Additionally, Plaintiff was not terminated until approximately two years after Erkin made the retirement offers to him.  *See, e.g.*, *Amaya v. Ballyshear L.L.C.*, 295 F. Supp. 3d 204, 220 (E.D.N.Y. 2018) (finding that a more than four-month gap between termination and any alleged discrimination was too large to demonstration a causal connection as a matter of law).

Plaintiff has also failed to identify any similarly situated employees outside his protected class who were treated more favorably than him.  Even though Fahmy and Vargas also indicated that they were not interested in an early retirement offer, both of them were within the same protected class as Plaintiff.

Further weighing against an inference of age discrimination is the fact that Erkin, who made Plaintiff the early retirement offers and later recommended his termination, was 54 years old at the time of Plaintiff's termination and a member of the same protected class as Plaintiff.  *See, e.g.*, *Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 769-70 (E.D.N.Y. 2018) ("Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee." (quoting *Bauger v. Spanish Broad Sys., Inc.*, No. 04-CV-8393, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010))); *Williams v. N.Y.C. Hous. Auth.*, No. 18-CV-59212 (JGK) (RWL), 2021 WL 1109842, at *12 n.12 (S.D.N.Y. Mar. 23, 2021) ("Courts have recognized that plaintiff's allegations of discrimination based on membership in a protected class are weakened, such that an inference of discrimination without any additional evidence may be unwarranted, when the decisionmaker and the plaintiff are members of the same protected class.").

Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's ADEA and NYSHRL claims based on age-related discrimination.

### 2. Age-Based Retaliation under the ADEA and the NYSHRL

#### a. *Legal Standard*

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims.

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that "(1) [he] engaged in a protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Schiano*

*v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)); *see Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877 (LAP), 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coch Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Loc. L. No. 85. It may include making a formal or informal complaint. *Gonzalez v. N.Y.C. Transit Auth.*, No. 00-CV-4293 (SHS)(AJP), 2001 WL 492448, at *18 (S.D.N.Y. May 9, 2001). "While it is unnecessary for an individual to specifically invoke the word discrimination when complaining in order to alert [his] employer to [his] protected activity, there must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity." *Steele v. New York*, No. 20-CV-220, 2021 WL 1110769, at *5 (N.D.N.Y. Mar. 23, 2021) (alteration in original) (quoting *Lucio v. N.Y.C. Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014)). An employee's informal complaints about discrimination may qualify as a protected activity, "[b]ut such informal complaints 'must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [law]." *Livingston v. City of N.Y.*, 563 F. Supp. 3d 201, 247 (S.D.N.Y. 2021) (citation omitted).

The same basic principles are used to analyze retaliation claims under the ADEA, the NYSHRL, and Title VII. *See Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) (citing summary order) (NYSHRL and Title VII); *Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 176-77 (E.D.N.Y. 2017) (ADEA and NYSHRL); *Ehrbar*, 131 F. Supp. 3d at 32 (ADEA and NYSHRL).

"[T]he ability to file grievances is not a protected activity under Title VII." *See Tone v. U.S. Postal Serv.*, 242 F.3d 368, at *3 (2d Cir. 2000) (citation to summary order); *see also Gonzalez*, 2001 WL 492448, at *18 ("A union grievance hearing about overtime pay, unrelated to discrimination, is simply not a Title VII 'protected activity' that could give rise to a cognizable Title VII retaliation claim."); *Wheeler v. Corp. Counsel of N.Y.C.*, 93-CV-5184, 2000 WL 1760947, at *12 (S.D.N.Y. Nov. 30, 2020)

(plaintiff did not engage in a protected activity when he filed a grievance but "[i]t does not appear from the record, however, that this claim included any charge of discrimination.").

An "adverse employment action" is one that is "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42-43 (2d Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In determining whether an action constitutes an "adverse employment action," "the proper question for a retaliation claim is 'whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.'" *Id.* at 44 (alteration in original) (quoting *Kessler*, 461 F.3d at 209).

   *b.  Application of Facts to Law*

Plaintiff argues that he was terminated in retaliation for making the overtime grievance and rejecting Erkin's retirement offers.  (Pl. Mem. of Law at 1, 7, 8 (citing Pl. 56.1 ¶¶ 13-20).)  He specifically states that "[Plaintiff's] claim before this Court [is] not for the facts underlying the grievance, but rather that he was terminated for making the grievance."  (*Id.* at 8 (citing Pl. 56.1 ¶ 20).)

In determining whether Plaintiff has established a *prima facie* case of retaliation, the Court looks first at whether either of these actions is a "protected activity."

Plaintiff argues that the grievance was "a potential ADEA claim since the overtime was given to a younger employee, Katheline Compere." (*See* Pl. Mem. of Law at 8.)  However, there is nothing in the record indicating that Plaintiff raised the issue of age at the time he brought the grievance.  In order for the grievance to constitute a protected activity, Plaintiff must plausibly show that Defendant was aware that his complaint was about age discrimination. *See Steele*, 2021 WL 1110769, at *4 (finding that the plaintiff failed to plausibly show "that his employer was aware that his opposition to the disciplinary proceedings was a form of Title VII opposition.").  In his April 5, 2019 written statement describing the overtime conflict with Compere, Plaintiff did not mention age as a factor in what

22

happened. (*See* Voluntary Statement Form.) Rather, he described not getting the overtime shifts because Compere falsely told Morozov that Plaintiff did not want them. When Plaintiff confronted Compere, she yelled at him. Plaintiff requested an investigation into Compere's lie and conduct toward Plaintiff, not anything related to discrimination based on his age. (*See id.*) Plaintiff raised no issue of discrimination at the time, and he has not identified any facts in the record now that demonstrate that Defendant should have known that his complaint was age-related.

Similarly, Plaintiff's rejection of Erkin's early retirement offers does not constitute a protected activity. Plaintiff told Erkin that he was not ready to retire, not that he believed the offers of retirement were discriminatory, unlawful, or coercive.[4] (Def. 56.1 ¶ 21; Pl. 56.1 ¶¶ 21, 59; Pl. Tr. 170:25-171:2, 173:14-19.) Because it is not unlawful for an employer to make a retirement offer to an employee, there is no reasonable basis for Erkin to know that Plaintiff was complaining about prohibited conduct when Plaintiff stated that he was not ready to retire. (*See* Def. 56.1 ¶ 21; Pl. 56.1 ¶¶ 21, 59; Pl. Tr. 170:25-171:2, 173:14-19.) Plaintiff and Defendant disagree over whether Erkin continued to make the early retirement offer to Plaintiff "throughout 2017" (*see* Pl. 56.1 ¶ 23; Def. 56.1 ¶ 23), but that disagreement over timing is immaterial.

Because a jury could not plausibly find that Plaintiff's grievance or rejection of the retirement offers constitutes a protected activity, his retaliation claims fail as a matter of law. Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's ADEA and NYSHRL claims based on age-related retaliation.

---

[4] Plaintiff alleges in the Complaint that "[o]n several occasions throughout 2017, [he] voiced his opinion to Metin Erkin that he disagreed with the Hotel's early retirement offer to older employees" (Compl. ¶ 20), but the record does not show that Plaintiff made any such complaints. In any event, Plaintiff contends in his Opposition that he was terminated for rejecting the retirement offers, not for voicing disagreement with Defendant's policy. (*See, e.g.*, Pl. Mem. of Law at 1 ("the Hotel retaliated against Mr. Hossain for Mr. Hossain's refusal [of] the Hotel's offer of early retirement by terminating Mr. Hossain . . . ."); *id.* at 3 ("Mr. Hossain was terminated after he made a grievance for overtime in violation of the ADEA and after he refused an early retirement offer.").)

### 3. **Age-Based Hostile Work Environment under the ADEA and the NYSHRL**

#### a. *Legal Standard*

"The standards for evaluating hostile work environment claims are identical under Title VII, the ADEA, and the NYSHRL." *Lebowitz*, 407 F. Supp. 3d at 181. "To establish a claim for a hostile work environment . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 392, 401 (S.D.N.Y. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[T]he misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d Cir. 2010) (citation omitted)). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted)).

In analyzing a hostile work environment claim, the court looks at "a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [] whether it unreasonably interferes with an employee's work performance,'" and "the extent to which the conduct occurred because of the plaintiff's [protected characteristic]." *Id.* (quoting *Harris*, 510 U.S. at 23) (citations omitted).

#### b. *Application of Facts to Law*

Plaintiff argues that the following evidence supports a *prima facie* case of hostile work environment: (1) Erkin "was targeting him and treating him unfairly after asking for a prayer room"

(Pl. Mem. of Law at 6 (citing Pl. 56.1 ¶ 62)); (2) Erkin "continuously brought up the subject of [his] retirement despite [Plaintiff] making it clear that he did not want to retire" (*id.* (citing Pl. 56.1 ¶ 59)); and (3) Erkin "surveilled [him] for clocking into work early, even though [he] had the authority to do so as Supervisor of Order Takers/Cashiers." (*Id.* (citing Pl. 56.1 ¶¶ 6, 51).) Plaintiff states that "[t]hese incidents, in totality" made him feel uncomfortable. (*Id.* (citing Pl. 56.1 ¶ 49).)

Plaintiff's request for a prayer room is unrelated to his age and any backlash he allegedly faced for making the request cannot contribute to the creation of a hostile work environment based on age.

As to Erkin's repeated statements regarding retirement, Plaintiff does not identify any facts that demonstrate, or even allege, that the offers were physically threatening, humiliating, or intimidating or that they interfered with his performance in any way. There is neither subjective nor objective evidence that Defendant's conduct created a hostile environment for Plaintiff.

Finally, although Plaintiff argues that Erkin "surveilled" him, the record does not establish that Erkin engaged in behavior that could, as a matter of law, contribute to a hostile work environment. Plaintiff describes a single incident on October 14, 2019 when Erkin asked Plaintiff why he had clocked in early the day before. (Pl. Tr. 201:7-9.) Plaintiff provided an explanation, and the inquiry ended. (*See* Ex. E to Rahman Decl. at 1.) Plaintiff admits that he did, in fact, punch in before his shift started on that date, further demonstrating that there was nothing untoward about Erkin's questions. (*See* Pl. Tr. 201:7-16; Ex. E to Rahman Decl. at 1.) Plaintiff does not identify any other surveillance by Erkin. Overseeing an employee's work and ensuring that he clocks in and out on time "are common and appropriate ways an employer may monitor its employees." *MacEntee v. IBM*, 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011). Moreover, there is no evidence that Erkin's questions to Plaintiff about his timesheet were related to Plaintiff's age.

These incidents are not "severe or pervasive enough" for a reasonable jury to find that Defendant "create[d] an objectively hostile or abusive work environment" based on Plaintiff's age.

Plaintiff does not allege hostility other than in conclusory terms. Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's age-based hostile work environment claims under the ADEA and the NYSHRL.

### B. *The NYCHRL (Claim III)*

#### 1. <u>Age-Based Discrimination under the NYCHRL</u>

##### a. *Legal Standard*

The NYCHRL bars discrimination on the basis of an employee's "actual or perceived" age. N.Y.C. Admin. Code § 8-107(1)(a); *see Rimpel*, 486 F. Supp. 3d at 634.

"In this Circuit, NYCHRL claims must be analyzed 'separately and independently from any federal and state law claims.'" *Summit v. Equinox Holdings, Inc.*, No. 20-CV-4905 (PAE), 2022 WL 2872273, at *17 (S.D.N.Y. July 21, 2022) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). Courts analyze NYCHRL discrimination claims under the *McDonnell Douglas* framework, but apply a less rigorous standard. Rather than require that a plaintiff demonstrate a "materially adverse" action, the NYCHRL requires that a plaintiff establish that he "was treated 'less well' than other similarly situated employees 'at least in part for discriminatory reasons.'" *Williams*, 2021 WL 1109842, at *21 (quoting *EEOC v. Bloomberg L.L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013)). "However, the NYCHRL is not a '"general civility code",' and a plaintiff 'still bears the burden of showing that the conduct is caused by a discriminatory motive.'" *Jackson v. City of N.Y.*, 29 F. Supp. 3d 161, 173 (E.D.N.Y. 2014) (quoting *Mihalik*, 715 F.3d at 110 (citation omitted)).

"An employer is only entitled to summary judgment 'if the record establishes as a matter of law that discrimination played *no* role in its actions.'" *Sohnen v. Charter Commc'ns, Inc.*, No. 18-CV-6744 (LDH)(RLM), 2022 WL 900602, at *10 (E.D.N.Y. Mar. 28, 2022) (emphasis in original) (quoting *Mihalik*, 715 F.3d at 110 n.8 (citation omitted)).

b. *Application of Facts to Law*

Plaintiff has not established that he was treated "less well" than similarly situated colleagues who were younger or perceived to be younger. He has identified no comparators who were younger or perceived to be younger than him. All the other Order Takers/Cashiers identified by Plaintiff were close in age to him. Although he believed that four other individuals took advantage of the Paid Rest Period Policy, he does not identify them or their ages. (*See* Pl. Tr. 110:23-111:14.) The only person he identifies as having taken paid rest is Fahmy (Pl. Tr. 111:15-112:23, 118:9-17), but she was 71 years old in April 2021 (Fahmy Tr. 7:24-25) and thus older, not younger, than Plaintiff. (*See also* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) Likewise, Vargas, who similarly rejected the offer of early retirement, was approximately 70 years old, also older than Plaintiff.

Despite the NYCHRL's less demanding standard, Plaintiff's claim under this statute fails because the record shows as a matter of law that age discrimination played no role in Defendant's treatment of Plaintiff. Accordingly, I respectfully recommend granting summary judgment with respect to Plaintiff's NYCHRL age-discrimination claim.

## 2. **Age-Based Retaliation under the NYCHRL**

a. *Legal Standard*

The NYCHRL prohibits employers from retaliating against "any person . . . because such person has . . . opposed any practice forbidden under [the NYCHRL]." *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 627 (E.D.N.Y. 2017), *aff'd*, 752 F. App'x 64 (2d Cir. 2018) (alteration in original) (quoting N.Y.C. Admin. Code § 8-107(7)(i)). The *McDonnell Douglas* burden-shifting framework is used to analyze NYCHRL retaliation claims, but to a less stringent degree. "Thus, to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (first citing *Albunio v.*

27

*City of N.Y.*, 16 N.Y.3d 472, 479 (N.Y. 2011), then citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S. 2d 27, 33-34 (N.Y. App. Div. 1st Dept. 2009)).  The phrase "an action opposing his employer's discrimination" should be interpreted broadly.  *See EEOC*, 967 F. Supp. 2d at 838 (citation omitted); *Albunio*, 16 N.Y.3d at 479.  Additionally, but-for causation is not required; instead, Plaintiff need only demonstrate that "retaliation played any part in the employer's decision." *Maynard*, 2021 WL 396700, at *6 (citation omitted).

"[S]ummary judgment is appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'play[ed] no role' in the defendant's actions." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 800 (S.D.N.Y. 2020) (alteration and emphasis in original) (quoting Mihalik, 715 F.3d at 110 n.8 (citation omitted)).

       b.   *Application of Facts to Law*

Plaintiff's overtime grievance does not constitute an action opposing discrimination by Defendant, as discussed above.  Although Plaintiff now argues that his grievance was made to protest Defendant's age-based discrimination, he points to no facts in the record to support this.  *See Smith v. Arnone*, No. 13-CV-971 (JBA), 2016 WL 3064050, at *3 (D. Conn. May 27, 2016) ("[Plaintiff] cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry [his] burden on summary judgment." (alteration in original) (quoting *Salahuddin*, 467 F.3d at 272)).  Not only did Plaintiff not directly raise the issue of discrimination in his grievance, but the facts underlying his grievance also do not support any inference of disparate treatment based on age.  Plaintiff complained that his coworker Compere received overtime shifts instead of him because she lied to Defendant, not because of his age.  (*See* Voluntary Statement Form.)  Compere was only "a few years younger than" Plaintiff.  (Pl. Tr. 65:2-11.)  He also did not complain that Compere's yelling at him when confronted constituted discriminatory conduct by Defendant.

Plaintiff has not established that his rejection of the early retirement offers was an action opposing discrimination.  Because offers of early retirement are themselves not discriminatory, *see supra* Part II.A.1.b, Plaintiff's rejections of the offers do not amount to opposition to a practice that is unlawful under the NYCHRL.[5]  Assuming *arguendo* that Plaintiff's actions were in opposition to a forbidden practice, there is no evidence of a connection between Plaintiff's rejection of the early retirement offers and his termination two years later.  *See, e.g.*, *Kraiem v. JonesTrading Inst. Servs. L.L.C.*, 571 F. Supp. 3d 53, 62 (S.D.N.Y. 2021) (finding one-year gap between plaintiff's action and defendant's alleged retaliatory conduct was too large to support a causal connection in the context of NYCHRL and NYSHRL retaliation claims).

Even under the NYCHRL's more liberal standard, "the record here could not support either an inference of retaliation or a finding that defendants did anything reasonably likely to deter a person from engaging in protected activity."  *Benzinger v. Lukoil Pan Ams., L.L.C.*, 447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020).  Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's NYCHRL age-based retaliation claim.

### 3.  Age-Based Hostile Work Environment under the NYCHRL

#### a.  *Legal Standard*

Under the NYCHRL, courts do not consider "the 'severity' and 'pervasiveness' of the alleged harassment" to determine "the question of underlying liability."  *Pierre v. City of N.Y.*, No. 17-CV-5782 (JGK), 2020 WL 353538, at *11 (S.D.N.Y. Jan. 21, 2020) (quoting *Williams*, 872 N.Y.S. 2d at 38 (citation omitted)), *aff'd*, 844 F. App'x 411 (2d Cir. 2021).  "Thus, less egregious conduct than that required under [federal law] may support a hostile work environment claim under the NYCHRL."  *Id.* (quoting *Panzarino v. Deloitte & Touche L.L.P.*, No. 05-CV-8502, 2009 WL 3539685, at *9 (S.D.N.Y.

---

[5] In any event, the facts surrounding Plaintiff's rejection of the offers do not demonstrate that he believed the offers were discriminatory.  *See supra* Part II.A.2.b.

Oct. 29, 2009)). "Summary judgment is available where the employer can prove that the alleged conduct does not even represent a 'borderline' violation, but 'could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences.'" *Pierre*, 2020 WL 353538, at *12.

> b. *Application of Facts to Law*

Applying the less stringent standard of the NYCHRL, a reasonable juror could not interpret the retirement offers and Erkin's "surveillance" as even a borderline violation contributing to the creation of a hostile work environment based on Plaintiff's age. Although Plaintiff states that "[t]hese incidents, in totality" made him feel uncomfortable (Pl. Mem. of Law at 6 (citing Pl. 56.1 ¶ 49)), as discussed *supra*, offers of early retirement are not in themselves problematic, *see Boonmalert*, 2017 WL 1378274, at *4; and Erkin's monitoring of Plaintiff's timesheet is clearly within his purview as Plaintiff's supervisor. *See, e.g.*, *MacEntee*, 783 F. Supp. 2d at 446; *Pierre*, 2020 WL 353538, at *12 ("criticism about the plaintiff's attendance" does not create a hostile work environment).

Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's age-based hostile work environment claim under the NYCHRL.

## C.  *42 U.S.C. § 1981 (Claim IV)*

Plaintiff alleges age-based discrimination, retaliation, and hostile work environment under 42 U.S.C. § 1981. Section 1981 does not cover age-related claims. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is [ ] settled that Section 1981 does not prohibit discrimination on the basis of . . . age." (citing *Kodish v. United Air Lines, Inc.*, 628 F.2d 1301, 1303 (10th Cir. 1980))).

Accordingly, I respectfully recommend that summary judgment be granted with respect to Claim IV.[6]

---

[6] Claim IV includes an allegation that Plaintiff was treated differently because of his race. (*See* Compl. ¶ 54.) Because Plaintiff's Opposition contains no arguments related to his race and there are no facts in the record to support a *prima facie* case of race-based discrimination, I recommend that summary judgment be

30

III.    **Claims Based on Religion**

Claims XI through XIII allege religion-based discrimination, retaliation, and hostile work environment under Title VII (Claim XI), the NYSHRL (Claim XII), and the NYCHRL (Claim XIII).

A.  *Title VII (Claim XI) and the NYSHRL (Claim XII)*

Claims under Title VII and NYSHRL for discrimination, retaliation, and hostile work environment based on religion are subject to the same legal analysis as age-based claims under the ADEA and the NYSHRL, s*ee Holcomb*, 698 F. App'x at 31; *Chavis*, 265 F. Supp. 3d at 398; *Lebowitz*, 407 F. Supp. 3d at 181; *Ehrbar*, 131 F. Supp. 3d at 19, except that Title VII, like the NYSHRL, requires at the final *McDonnel Douglas* stage in analyzing a discrimination claim that "a plaintiff need meet only the less rigorous 'motivating factor' standard," *Milord-Francois*, 2022 WL 480477, at *2, rather than the but-for standard applicable to ADEA claims.  A showing of but-for causation is required for Title VII retaliation claims.  *Campbell v. N.Y.C. Trans. Auth.*, 93 F. Supp. 3d 148, 178-79 (S.D.N.Y. 2015) (citations omitted).

1.    **Religion-Based Discrimination under Title VII and the NYSHRL**

Despite alleging claims of discrimination based on religion in the Complaint, Plaintiff does not make any arguments in support of those claims in his Opposition.  Plaintiff states that he was called "Mullah" and that he requested a prayer room, but he does not refute Defendant's arguments for summary judgment with respect to his religion-based discrimination claims.  (*See, e.g.*, Def. Mem. of Law at 6-7, 15.)  Therefore, the Court deems these claims abandoned.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.");  *Johnston v. Town of Orangetown*, No. 10-CV-8763 (GAY), 2013 WL 1189483, at *7 n.3

---

granted as to Plaintiff's Section 1981 claim to the extent it alleges race-based disparate treatment.  *See infra* Part IV.

(S.D.N.Y. Mar. 22, 2013) ("Plaintiff failed to respond to defendants' arguments and, thus, apparently concedes defendants' points and waives said claims."), *aff'd*, 562 F. App'x 39 (2d Cir. 2014).[7]

Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's religion-based discrimination claims under Title VII and the NYSHRL.

### 2. Religion-Based Retaliation under Title VII and the NYSHRL

Plaintiff does not argue in his Opposition how Defendant retaliated against him for engaging in a protected activity related to his religion. Plaintiff's request for a prayer room qualifies as a protected activity, *see, e.g.*, *Livingston*, 563 F. Supp. 3d at 246 ("[B]oth parties agree that Plaintiff's request for a religious accommodation was protected activity."); *see also Sivio*, 436 F. Supp. 3d at 801 (finding plaintiff's request for medical accommodation constituted protected activity under NYSHRL and other statutes). However, while Plaintiff "testified that he felt that Defendant's HR Director was targeting him and treating him unfairly after asking for a prayer room," (Pl. Mem. of Law at 6), he does not describe what that unfair treatment was or how it constituted retaliation.[8] Plaintiff's "feeling" and conclusory statement that he was treated unfairly after requesting a prayer room do not establish that he suffered an adverse employment action as a result of the request.[9] *See, e.g.*, *Jackson*,

---

[7] Defendant also argues that the statute of limitations bars these claims. The statute of limitations for Title VII claims is 300 days from the filing of the EEOC complaint. *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 246 (E.D.N.Y. 2015); *Dimitracopoulos v. City of N.Y.*, 26 F. Supp. 3d 200, 210 (E.D.N.Y. 2014). Here, the cutoff date would be May 3, 2019. Plaintiff's NYSHRL claims must allege conduct that occurred within three years of his filing of the EEOC complaint, that is, sometime after February 27, 2017. *See Soloviev*, 104 F. Supp. 3d at 246; *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011); C.P.L.R. 214(2). Because Plaintiff requested a prayer room in 2015 at the latest, his requests occurred outside the statute of limitations, and any actions by Defendant causally linked to his requests would also fall outside the applicable time period.

[8] Plaintiff argued that this fact supports a *prima facie* case of hostile work environment based on Plaintiff's age (*see* Pl. Mem. of Law at 6), but it is better analyzed in the context of Plaintiff's religion-based retaliation claims.

[9] Because the request was ultimately granted, any delay in designating the prayer room does not constitute an adverse employment action. *See Dechberry v. N.Y.C. Fire Dep't.*, 124 F. Supp. 3d 131, 148 (E.D.N.Y. 2015) (finding employer's delay of over one year in providing plaintiff with medical accommodation did not constitute an adverse employment action where plaintiff did "not allege any negative impact on her employment or that the delay materially changed the terms and conditions of her employment").

29 F. Supp. 3d at 172 ("Although the standard to establish a prima facie case is not high, conclusory allegations alone are insufficient to support an inference of discrimination." (quoting *Vaughn v. City of N.Y.*, 06-CV-6547 (ILG), 2010 WL 2076926, at *9 (E.D.N.Y. May 24, 2010) (citation omitted))); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." (quoting *Little v. New York*, No. 96-CV-5132 (SJ), 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998), *aff'd*, 1999 WL 220147 (2d Cir. Apr. 14, 1999))).

Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's religion-based retaliation claims under Title VII and the NYSHRL.

### 3.  Religion-Based Hostile Work Environment under Title VII and the NYSHRL

Plaintiff's feeling that Erkin treated him unfairly and targeted him after his request for a prayer room is insufficient to establish that "an objectively hostile or abusive work environment" was created, and Plaintiff has not identified any other facts in the record that would support such a finding.  While Plaintiff alleges that he was called "Mullah," which is a religious term (Pl. 56.1 ¶ 61 (citing Pl. Tr. 175:17-176:7)), he admits that Erkin never called him that, that he was not offended by the term, and that he took it as a joke.  (*See* Pl. 56.1 ¶ 61; Def. 56.1 ¶ 61 (citing Pl. Tr. 175:17-176:16).)

Accordingly, I respectfully recommend granting summary judgment with respect to Plaintiff's religion-based hostile work environment claims under Title VII and the NYSHRL.

### B.  *The NYCHRL (Claim XIII)*

### 1.  Religion-Based Discrimination under the NYCHRL

The NYCHRL bars discrimination on the basis of an employee's "actual or perceived" creed. N.Y.C. Admin. Code § 8-107(1)(a).

As discussed above, Plaintiff provides no factual description of how Defendant discriminated against him based on religion.  Plaintiff has also not identified any similarly situated colleagues of a

different religion who were treated better than he was. Plaintiff's feeling—which he articulated in his deposition—that the prayer room designation would have happened more quickly had he been of another religion, is insufficient to demonstrate that he was treated less well than anyone else. (*See* Pl. Tr. 181:24-182:4); *see, e.g.*, *Smalls*, 396 F. Supp. 2d at 371; *Jackson*, 29 F. Supp. 3d at 172. Accordingly, I respectfully recommend granting summary judgment with respect to Plaintiff's religion-based discrimination claim under the NYCHRL.[10]

### 2.  Religion-Based Retaliation under the NYCHRL

Plaintiff does not describe what retaliatory conduct Defendant subjected him to as a result of his request for a prayer room. Thus, even under the more liberal standard of the NYCHRL, Plaintiff's religious retaliation claim fails. Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's religion-based retaliation claim under the NYCHRL.

### 3.  Religion-Based Hostile Work Environment under the NYCHRL

Plaintiff's vague allegation that he was targeted and treated unfairly after he requested a prayer room is insufficient to establish a hostile work environment even under the NYCHRL's more liberal standard. There are no facts that demonstrate that Plaintiff endured even "petty slights or trivial inconveniences" connected to his religion.

Accordingly, I respectfully recommend granting summary judgment with respect to Plaintiff's hostile work environment claim under the NYCHRL.

---

[10] Plaintiff's NYCHRL discrimination claims must allege conduct that occurred after February 27, 2017. *See, e.g.*, *Soloviev*, 104 F. Supp. 3d at 246 (noting the statute of limitations for NYHCRL claims is three years from the date of the EEOC filing). Because Plaintiff requested a prayer room in 2015 at the latest, any religion-based discrimination claim premised on that fact is also likely barred as occurring outside the NYCHRL's statute of limitations.

## IV.   Claims Based on Race/Color

Claims V through VII allege discrimination, retaliation, and hostile work environment based on Plaintiff's race/color pursuant to Title VII (Claim V), the NYSHRL (Claim VI), and the NYCHRL (Claim VII).

In Plaintiff's Opposition, he makes no arguments related to his race/color and does not respond to Defendant's arguments for summary judgment on those claims.  (*See, e.g.*, Def. Mem. of Law at 4, 5, 7, 15.)   Plaintiff has an obligation to "point to specific evidence in the record" demonstrating a genuine issue for trial and "cannot rest on allegations in the pleadings."  *Salahuddin*, 467 F.3d at 273 (citation omitted).  Here, however, even the pleadings do not contain non-conclusory allegations to support Plaintiff's race-based claims.  Additionally, upon a review of the record, there appear to be no facts related to Plaintiff's race/color other than the mere fact that Plaintiff is Asian.[11] There are no facts to support any allegation that being Asian played any role in discriminatory or retaliatory conduct directed at Plaintiff, that Plaintiff opposed any racial discrimination by Defendant, or that there was any hostile work environment based on race.

Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's race/color discrimination, retaliation, and hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL.

## V.   Claims Based on National Origin

Claims VIII through X allege discrimination, retaliation, and hostile work environment based on Plaintiff's national origin pursuant to Title VII (Claim VIII), the NYSHRL (Claim IX), and the NYCHRL (Claim X).

---

[11] In his deposition, Plaintiff stated that he believed that at least four other employees faced discriminatory treatment for various reasons (*see* Pl. Tr. 41:21-42:16), but these allegations are immaterial because Plaintiff does not allege that he himself faced any negative treatment because of his race/color or engaged in any protected activity related to the alleged discrimination.

35

Plaintiff admits that he "did not have any facts that suggest his termination was motivated by his Bangladeshi national origin." (*See* Pl. 56.1 ¶ 63; Def. 56.1 ¶ 63.) Additionally, there are no facts (or allegations) that Plaintiff was discriminated against because of his national origin or that he opposed any discrimination by Defendant based on national origin. Accordingly, I respectfully recommend that summary judgment be granted with respect to Plaintiff's national origin-based discrimination, retaliation, and hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL.

<u>**CONCLUSION**</u>

For the aforementioned reasons, I respectfully recommend that the Motion be granted in its entirety, and that summary judgment be granted with respect to all claims.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
            August 31, 2022

36